Brendan O'Rourke*
borourke@proskauer.com
Jonathan Weiss, SBN 250307
jweiss@proskauer.com
Lee Popkin*
lpopkin@proskauer.com
Simona Weil, SBN 316449
sweil@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, 24th Floor
Los Angeles, CA  90067-3010
Telephone:    (310) 557-2900
Facsimile:    (310) 557-2193

Attorneys for Plaintiff
Young Hollywood LLC
* *pro hac vice* pending

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| YOUNG HOLLYWOOD LLC, a California limited liability company, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | **DEMAND FOR JURY TRIAL** |
| WHITE OPS, INC., a Delaware corporation, | |
| Defendant. | |

## NATURE OF THE ACTION

1.      White Ops is a cybersecurity company that claims to protect its clients in the digital advertising space from fraudulent internet traffic.  White Ops touts its ability to "verify the humanity of more than a trillion interactions every week."  But when its algorithm fails to distinguish between bots and human beings, the self-described "police" of the internet becomes something altogether different:  a tormentor rather than a protector.

2.      The repercussions on a website's business when White Ops mislabels its inventory as "fraudulent" can be devastating.  Rather than acknowledge the inherent flaw in its fraud detection technology, White Ops tells the websites whose traffic it erroneously flags as invalid that there is one way to fix the problem: become a White Ops client.  You have to pay White Ops a minimum of ten thousand dollars *every month* to protect your website from them, with an upfront commitment of 12 months.  Worse yet, White Ops uses the fact that it "detected" and mislabeled your website's legitimate traffic as fraud to bolster its claims about the utility of its services.  It is no wonder that unscrupulous companies in the advertising verification industry have been dubbed by some in the industry as the "ad tech mafia."

3.      Young Hollywood publishes celebrity and lifestyle video content on its websites.  The Founder and CEO of the company has spent the last thirteen years building the company and its brand into a leading producer of digital content for Millenial and Gen Z audiences.  Young Hollywood grew from a small startup into a multifaceted media company valued at over 100 million dollars.  All of that changed when, in July 2019, White Ops falsely classified Young Hollywood's entire advertising space inventory as invalid traffic, preventing Young Hollywood from selling advertisements and thereby cutting off its ability to generate revenue.

4.      Young Hollywood contacted White Ops over months to ask why its traffic was being falsely flagged as invalid, explaining again and again the devastating impact that White Ops' filter was having on its business.  However, Young

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Hollywood refused to become a paying White Ops client as a condition to receiving instructions on how to "fix" the problem.  In the face of these refusals, White Ops ignored evidence that its supposed bot-catching algorithm was flawed, in that it captured legitimate web traffic.  For White Ops to have acknowledged that its algorithm was unable to distinguish accurately between rewarded human traffic and bots would have shown either that its authentication product was not the infallible bot slayer claimed, jeopardizing its position in the marketplace, or that White Ops was artificially inflating its subscription numbers by forcing digital media companies like Young Hollywood to pay a hefty subscription fee or face blacklisting.  Ultimately, Young Hollywood was sacrificed to White Ops' need to conceal its error-prone algorithm, an extortionate business model, or both.

5.     As a result of White Ops' conduct, Young Hollywood has been unable to sell video advertisements to its clients of many years, the company's reputation has been ruined, and the business is now on the verge of collapse.  Without immediate action, Young Hollywood will not be able to continue operating. White Ops should not be permitted to continue these unlawful business practices.  It should not be able to force companies like Young Hollywood to choose between paying up or shutting down.

6.     Young Hollywood brings this complaint against White Ops for (1) Defamation in Violation of Cal. Civ. Code §§ 45-46, (2) Trade Libel, (3) Product Disparagement in Violation of 15 U.S.C. § 1125(a)(1)(B), (4) Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*., (5) Intentional Interference with Prospective Economic Advantage, (6) Negligent Interference with Prospective Economic Advantage, (7) False Advertising in Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*., and (8) Negligence.

## THE PARTIES

7.     Young Hollywood is a California limited liability company with its principal place of business located at 10100 Santa Monica Blvd, Suite #400, Los

3

Angeles, CA 90025.  All members of Young Hollywood LLC reside, have their principal place of business, or are incorporated in California.

8.    Defendant White Ops is a Delaware corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

9.    This action arises under the Lanham Act, a federal statute codified at 15 U.S.C. §§ 1051, *et seq*., and California state law.

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1).  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

11.    This Court has personal jurisdiction over White Ops because (i) White Ops conducts business within the State of California and this judicial district; (ii) the causes of action asserted in this Complaint arise out of White Ops' contacts with the State of California and this judicial district; and (iii) White Ops has caused tortious injury to Young Hollywood in the State of California and this judicial district.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because (i) the causes of action asserted in this Complaint arise out of White Ops' contacts with the State of California and this judicial district; and (ii) White Ops has caused tortious injury to Young Hollywood in the State of California and this judicial district.

## FACTS COMMON TO ALL COUNTS

**Young Hollywood's Debut**

13.    Founded in 2007, Young Hollywood is a publisher and distributer of exclusive, premium celebrity and lifestyle content for Millennial and Gen Z audiences.  Young Hollywood consists of ten fully developed media brands that own and control a video library of over 10,000 hours of premium content.  Each year, the company finances, produces and distributes approximately 500 hours of new content.

14.     As a leader in the digital space for video content, Young Hollywood operates several digital platforms, including two primary websites: www.younghollywood.com and www.younghollywoodtv.com (the "YH Websites").

15.     Young Hollywood utilizes multiple security systems to ensure the traffic to the YH Websites is clean and not fraudulent (*i.e.* real, human traffic), including subscriptions with Rackspace, Cloudflare, and Alert Logic.

16.     In 2010, Young Hollywood began operating a broadcast studio out of the Four Seasons Hotel in Los Angeles.  Over the last decade, this studio has been frequented by thousands of high profile actors, musicians, and athletes including Selena Gomez, Vin Diesel, Justin Timberlake, Matt Damon, Sofia Vergara, Channing Tatum, Kerry Washington and Emma Stone, all of whom have collaborated with Young Hollywood to create exclusive video content for the YH Websites.

17.     As a result of the tens of millions of dollars Young Hollywood has invested into the development of its brand, the company has amassed more than 10 million followers on social media, over 300 million views on its YouTube channel, billions of views across its distribution network, and over 300 million monthly user engagements.  Young Hollywood has been recognized by the Wall Street Journal as a "Web Video Pioneer," and the company has been featured in hundreds of high-profile publications, including Fortune and Forbes.  In 2015, Apple chose Young Hollywood as one of a select group of video content partners to build into the Apple TV device.

18.     Young Hollywood's revenue is derived exclusively from advertising and licensing its content.  Hundreds of well-known advertisers buy Young Hollywood's inventory.  Young Hollywood's long standing advertising partnerships with Fortune 500 brands have been covered in Adweek and Adage, and its partnership with Google was the subject of a cover story in USA Today.  The YH Websites have also had significant direct partnerships with brands including Coca-Cola, EA, AT&T, Subway, Adidas, and Unilever, among others.  Young Hollywood has worked with these advertising partners to create content for their celebrity spokespeople including

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Carrie Underwood, Russell Westbrook, Kevin Hart, Trae Young, Venus Williams and others.  These direct partnerships alone have generated eight figure revenues for YH.

19.    Young Hollywood has grown its revenue exponentially year over year since inception.  In 2015 and 2016, three different investment banking firms appraised the company in connection with a capital raise and purchase offers, valuing it between 100 and 400 million dollars.  In 2018, Young Hollywood was named to the INC 5000 list of the fastest growing companies in America.  Young Hollywood's revenues continued to grow until June 2019, when, as described below, White Ops falsely classified Young Hollywood's inventory as invalid traffic ("IVT").

**Young Hollywood's Advertising Strategy**

*Telaria (Supply Side Provider)*

20.    In 2008, Young Hollywood signed an exclusive agreement with Telaria, Inc.,[1] a supply-side platform that monetizes and manages premium video advertising inventory.  Telaria sells Young Hollywood's digital media advertising in exchange for a gross percentage of the sales.

21.    Telaria has internal security measures in place to make sure the advertising placements it sells through its platform are not fraudulent.

22.    In 2015, Telaria launched a Supply Side Platform ("SSP").  Telaria's SSP utilizes programmatic advertising, the automated buying and selling of online advertising.  What this means is that Young Hollywood's pre-video advertising inventory, *i.e.* the advertising space available before a video is played on YH Websites, is available to advertisers through an automated bidding process on Telaria's online marketplace.

---

[1] Telaria was known as Tremor Video until September 2017, when it changed its name to Telaria.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

*Prodege (Marketer)*

23.    Beginning in March 2015, Young Hollywood also began to work with Prodege, a consumer engagement and online marketing company, to market Young Hollywood content and drive traffic to the YH Websites.  Telaria was aware of Young Hollywood's use of Prodege's services, and in fact encouraged Young Hollywood to use Prodege.  From 2017 until September 2019, Prodege was the exclusive marketing company for younghollywood.com.

24.    Prodege has internal security measures in place to make sure the traffic it directs to the YH Websites is not fraudulent.

25.    Prodege offers digital marketing services under several "rewarded traffic" platforms, including Swagbucks, a gift card reward program for customers who watch videos, earn points, and redeem the points for gift cards.

*Rewarded Traffic*

26.    Rewarded traffic, which is also referred to as "incentivized traffic," is a widely used consumer engagement tool.  Under the rewarded traffic model, consumers participate in certain online activity, such as watching videos, and are then "rewarded" for their engagement with gift cards to top retailers or other benefits.

27.    Many companies, including Google, Amazon, and Comcast, use rewarded traffic as part of their marketing strategy.  Media companies such as Verizon, Viacom, and Comcast specifically use Prodege and their Swagbucks platform in order to drive traffic to their websites.

28.    Some digital advertising experts believe that rewarded traffic combats advertising fraud and predict that brands will increasingly employ incentivized advertisements, particularly on mobile platforms.

**White Ops Enters the Scene**

29.    Founded in 2012, White Ops is a cybersecurity company that claims to provide fraud detection services.  White Ops uses proprietary software and algorithms

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

to detect bots and fraudulent traffic, enabling it to measure the quality of a website's traffic.

30.     White Ops serves over 200 customers around the world, including some of the largest internet platforms.  These customers pay a monthly subscription fee in exchange for White Ops' services.

31.     White Ops deceives its customers by touting the ability of its fraud detection services to differentiate between human and bot traffic, when in fact, White Ops is unable to differentiate between bot traffic and rewarded human traffic.

32.     One of the services White Ops offers is MediaGuard pre-bid prevention API, a "pre-bid filter" intended to prevent fraud before publishers' advertising inventory is offered to advertisers for bidding.  In theory, the "pre-bid filter" evaluates every request for a bid and blocks fraudulent website traffic — known as invalid traffic or IVT —from being seen or offered to advertisers.

33.     White Ops publishes a "taxonomy" that lists categories White Ops considers to be IVT, with definitions and examples.  Declared rewarded traffic is not on this list.

34.     White Ops and its competitors, other ad verification companies, inconsistently tag ad requests as clean or fraudulent, meaning that White Ops may block an ad request that other ad verification companies determine is clean.

35.     White Ops regularly distributes reports to its customers which include a "blacklist" of domains associated with fraud.  The reports are intended to guide clients' purchasing decisions, advertising approaches, and marketing strategy.

*Relationship between Young Hollywood, White Ops, Telaria, and Prodege*

36.     In July 2018, Telaria became a client of White Ops.  From that time forward, all inventory on Telaria's platform, including Young Hollywood's inventory, was scanned by White Ops' pre-bid filter.

37.     Beginning in the end of 2018, Telaria repeatedly recommended that Young Hollywood subscribe to White Ops.

8

38.     White Ops was reporting less than two percent of Young Hollywood's inventory as IVT at the time.

39.     Some percentage of IVT is normal for any website operating on the internet.  According to Cloudflare, a leading website security company, "media and publishing websites' traffic usually comprises about 20% malicious bots."

40.     Young Hollywood explored using White Ops, but given the steep cost of the subscription and the absence of any significant problems with invalid traffic, Young Hollywood decided against it.

41.     In June 2019, Prodege, too, became a client of White Ops.  White Ops understood that Prodege's core business model involved rewarded traffic.  Dimitris Theodorakis, Head of Detection at White Ops, confirmed to Prodege that its rewarded traffic was not IVT under the White Ops classification system.

42.     White Ops, as a sophisticated party in the digital advertising landscape, generally knows the workings of an SSP platform and its reach to advertisers.  In other words, White Ops is familiar with the relationship between a publisher like Young Hollywood and advertisers on an SSP platform.

**White Ops Classifies Young Hollywood as IVT**

43.     Beginning in late June 2019, White Ops began classifying a significant portion of Young Hollywood's traffic as IVT and blocking its inventory from Telaria's exchange.

44.     On June 28th, 2019, Young Hollywood learned that Telaria was rejecting sixty-five to seventy percent of Young Hollywood's advertising supply due to the White Ops pre-bid filter.  This meant that sixty-five to seventy percent of the advertising opportunities Young Hollywood sought to sell were not being shown to advertisers.

45.     On information and belief, in addition to this increased filtering, the YH Websites were placed on White Ops' blacklist.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

46.    At the time, Telaria posited that the increased filtering had to do with a change in White Ops' algorithm.  Telaria sent Young Hollywood an email explaining: "White Ops just upgraded their algorithms to account for behavior they have been tracking that most closely aligns with high instances of Automated Browsing and Manipulated Behavior within the IVT (Invalid Traffic) Taxonomy.  Since we use White Ops for pre-bid IVT filtering, you may see instances of increased request filtering on your supply[.]"[2]

47.    By July 2, 2019, White Ops was blocking of "99% of traffic across all [of Young Hollywood's] sites" as IVT.

48.    Young Hollywood had historically generated millions of dollars of revenue from Telaria's platform.  That revenue fell by over 99% from June to July 2019.  By September 2019, Young Hollywood's Telaria-generated revenue was $12.

49.    By falsely accusing Young Hollywood of high instances of automated browsing and manipulated behavior, classifying the YH Websites as IVT, and blacklisting Young Hollywood, White Ops not only disrupted Young Hollywood's relationship with Telaria but also directly impacted Young Hollywood's ability to sell to advertisers.  White Ops' actions have caused Young Hollywood to lose its main source of revenue, digital video advertising.

50.    Further, by including the YH Websites on its blacklist and falsely informing White Ops customers that Young Hollywood has invalid traffic, White Ops has caused harm to Young Hollywood's reputation as a digital media provider.

**Young Hollywood Tries to Get Answers**

51.    Given the devastating impact to its business, as soon as Young Hollywood became aware that White Ops was blocking its inventory, it did everything possible to resolve the problem.

---

[2] According to White Ops' "taxonomy," automated browsing refers to a program or automated script that requests web content without user involvement and without declaring itself as a crawler, such as a botnet.  Manipulated behavior refers to a browser, application, or other program that triggers an ad interaction without a user's consent, such as an unintended click.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

*Young Hollywood Contacts White Ops*

52.     On July 10, 2019, R.J. Williams, the CEO of Young Hollywood, reached out directly to White Ops by email to "get to the bottom of what's happening." Young Hollywood's inquiry was directed not to a technical support representative, but to the Director of Business Development for White Ops, Justin Hypes.

53.     Mr. Hypes assured Mr. Williams that White Ops was "committed to double and triple checking [its] position" on traffic to the YH Websites and promised to "get back in touch as soon as [he] hear[d] word" from his technical account management lead.  In the very same email, Mr. Hypes suggested that "there may be some ways we can work together to help alleviate these problems[.]"

54.     During a follow-up telephone conversation, Mr. Hypes made it clear that becoming a client of White Ops is what it would take to resolve Young Hollywood's problem.  Mr. Hypes informed Mr. Williams that if Young Hollywood became a White Ops client, it would then have access to a "tool set," dashboards, and support that could help provide a solution.

55.     Young Hollywood, however, did not become a client, and, as a result, it remained on White Ops' blacklist.

56.     On July 24, 2019, Young Hollywood had another conversation with White Ops in an effort to resolve the issue related to its traffic.  Young Hollywood expected that members of White Ops' technical team would participate in the call. Instead, only members of White Ops' business development, sales, and "customer success" team joined.  It was clear from the call that White Ops would not provide more information to Young Hollywood because they were not a customer.

57.     Mr. Williams followed up with White Ops repeatedly, each time emphasizing the urgent nature of the problem and the detrimental impact White Ops' actions were having on Young Hollywood's business.  White Ops failed to provide any substantive response to Mr. Williams' inquiries.  Mr. Williams was told that nothing further could be communicated because Young Hollywood was not a White

Ops client.  White Ops also refused to remove the YH Websites from its blacklist while it investigated the issue.

58.     On September 24, 2019, Mr. Williams sent an email to the Chief Operating Officer of White Ops, Gene Fay, outlining Young Hollywood's problem and the steps it had taken to investigate the traffic to its website.  Mr. Williams explained that he was "simply trying to understand why White Ops is taking the position that it is and making us the target" and imploring White Ops to give him "direction on what needs to happen for [Young Hollywood] to get off this 'Black List' as quickly as possible."

59.     On September 26, 2019—over two months after Mr. Williams first contacted White Ops—Mr. Fay informed Mr. Williams that "after some internal discussions" it would "be notifying Telaria today that Younghollywood has been removed from the Telaria blocked list."

60.     Despite these assurances, however, White Ops never instructed Telaria to remove Young Hollywood from the blacklist.  Telaria, for its part, informed Young Hollywood that "the next steps [we]re on the White Ops side" and "[u]ntil White Ops tells us otherwise, we're maintaining status quo."  Throughout October 2019, White Ops led Young Hollywood to believe it was investigating and trying to resolve the issue.  Meanwhile, it continued to flag at least 75% of Young Hollywood's inventory.

*Prodege and Telaria Contact White Ops*

61.     Between June and September 2019, Prodege and Telaria also reached out to White Ops to investigate the cause of Young Hollywood's blocked traffic.  White Ops knew from these communications that Young Hollywood was a client of Prodege and Telaria.

62.     In response to one of these inquiries, White Ops informed Prodege on July 3, 2019 that its "team confirmed the traffic [on the YH Websites] for having high instances of Automated Browsing and Manipulated Behavior."

63. This explanation made little sense because White Ops had not previously categorized Prodege's traffic, which is exclusively rewarded traffic, as IVT and Prodege was the only traffic-driver the YH Websites used. Prodege noted that the White Ops algorithm change had "negatively impacted several clients[,] but "only YoungHollywood was put on a, for all intents and purposes, 'death penalty' list where the site cannot monetize at all." In other words, White Ops was specifically targeting Young Hollywood.

64. Prodege also sought clarification from Mr. Theodorakis, the Head of Detection at White Ops who had previously worked with Prodege, but he failed to provide any additional details about the situation, saying only that White Ops had "checked [its] systems a number of times and everything seems to be working as expected."

65. Prodege asked White Ops for more information about "why Young Hollywood was unfairly singled out" because White Ops had provided only a "very vague classification" of automation with no supporting evidence. White Ops, however, provided no further explanation and continued to categorize Young Hollywood's traffic as IVT.

66. Beginning in September 2019, in an effort to resolve the problem, Young Hollywood stopped using Prodege. Even during periods of time when traffic to the YH Websites was exclusively organic, meaning visitors landed on the YH Websites based on traffic that is earned not paid, there was no corresponding change to the level of IVT detected by White Ops.[3]  Young Hollywood made White Ops aware of this information, but White Ops engineers did not seem to believe that Young Hollywood had made the change. On October 31, 2019, almost two months after Young Hollywood had turned off Prodege, the Chief Operating Officer of White

---

[3] Between September 2019 and March 2020, Young Hollywood used the marketing services of InnovateMR, Facebook, and Yahoo Gemini intermittently. There were also multiple periods of time, in intervals of several weeks, during which Young Hollywood did not use any marketing service and traffic to younghollywood.com was exclusively organic.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Ops asked Mr. Williams if he was "sure Prodege is turned off" because their engineers "were still seeing it."

67.     In addition, there were unexplained jumps in the percentage of traffic White Ops classified as IVT that did not align with any change in Young Hollywood's marketing techniques, but instead appear to have been the result of manual manipulation by White Ops in the hours and days after Mr. Williams communicated with employees of White Ops.  For example, the IVT detected by White Ops went from 99% the day before an October 16, 2019 call between Mr. Williams and White Ops' Chief Operating Officer, to 30% the day after the call, only to jump up again in the ensuing weeks.

68.     Telaria's attempts to understand why White Ops was flagging Young Hollywood's web traffic were likewise unsuccessful.  On August 5, 2019, Telaria informed Young Hollywood that they had "pushed as hard as [they] can on this," but White Ops would not give them any additional information or feedback about why its changed algorithm was flagging the YH Websites.

*Young Hollywood Orders An Investigation Of Its Traffic*

69.     While waiting for White Ops to respond to its inquiries, Young Hollywood enlisted other third parties to examine the YH Websites.

70.     Young Hollywood asked Rackspace, the company that hosts Young Hollywood's websites, to investigate the traffic on the YH Websites.  After an extensive review of the environment in late July and early August 2019, Rackspace was unable to find any malicious or bot-like traffic and no evidence of any unusual activity.  Through the ensuing months, Rackspace continued to analyze traffic to the YH Websites, but found no suspicious activity.

71.     Through Rackspace, Young Hollywood also engaged the services of Alert Logic, a leading cyber security solution, and Cloudflare, a leading website security company.  Alert Logic and Cloudflare both investigated White Ops' claims of invalid traffic.  These companies, like Rackspace, found no noticeable changes to

14

1  the traffic to or from any of the servers for the YH Websites, no irregularities with the

2  IP addresses of visitors to the YH Websites, and no malicious or bot-like traffic in the

3  logs of the YH Websites.

4       72.    Young Hollywood also hired FTI Consulting to look into White Ops'

5  claims.  FTI's review, which included a review of the dark web, did not turn up

6  anything suspicious or unusual.

7  **White Ops' Sham Solution**

8       73.    At the Consumer Electronics Show in Las Vegas in January 2020, Mr.

9  Williams approached Michael Tiffany, the Co-Founder and President of White Ops,

10 to discuss the situation.

11      74.    Mr. Tiffany acknowledged that the updated White Ops algorithm could

12 not differentiate between incentivized traffic and IVT and that this was likely the

13 reason White Ops was flagging Young Hollywood's inventory.  Mr. Tiffany

14 acknowledged that declared incentivized traffic should not be considered IVT and

15 agreed that White Ops needed to fix this problem.  Mr. Tiffany assured Mr. Williams

16 that he would discuss the issue with his engineering team in order to expedite a

17 technical solution so that Young Hollywood would no longer be blocked.  The plan

18 was for White Ops and Young Hollywood to work together with SSP partners,

19 including Telaria and AT&T Xandr, to roll out a new product offering that would

20 enable advertisers to purchase incentivized traffic if they chose to do so.

21      75.    Following the in-person meeting, Mr. Williams sent an email

22 memorializing the discussion.  Mr. Williams reiterated that he "like[d] the ideas [Mr.

23 Tiffany] suggested" for resolving the problem and was "looking forward to receiving

24 [his] update this week and putting this plan into immediate action."  Mr. Williams

25 also asked if it would be possible to expedite the process of "unblock[ing] YH" so that

26 the company could "finally get [its] business back on track."

27      76.    In response, Mr. Tiffany confirmed that they were "a Go" on the plan.

28 He wrote to Mr. Williams: "let's push on getting an SSP partner that can consume a

new Incentivized/Rewarded output from MediaGuard." Mr. Tiffany agreed that they should run the idea by Telaria, AT&T Xandr, and Rubicon to see who could most quickly put the new product to use.

77.    Despite the plan and Mr. Tiffany's assurances, White Ops, in late January 2020, was still flagging Young Hollywood's inventory on the Telaria platform "for automated browsing/bots and other mechanisms[.]"

78.    On January 17, 2020, with its inventory still blocked and no word from White Ops on the new product offering, Mr. Williams emailed Mr. Tiffany, explaining that "time is of the essence" and that Young Hollywood had "already been waiting for months for a resolution[.]"

79.    Receiving no response, Mr. Williams emailed Mr. Tiffany again on January 28, 2020, pleading with him to provide a path for resolving the issue. In his January 28 email, Mr. Williams was transparent that his "entire business continue[d] to be at stake the longer this drags on" while voicing the frustration that everyone continues to "give [him] a different reason why White Ops is continuing to block us."

80.    On February 20, 2020, Mr. Williams again emailed Mr. Tiffany pointing out that there was "0 rewarded/incentivized traffic" to the YH Websites and yet their inventory was still being blocked. Mr. Williams asked if he could "please have an update as to what's going on?" White Ops never responded to any of these emails.

**White Ops' Changing Narrative**

81.    The initial explanation White Ops provided in July 2019 for why it was blocking Young Hollywood's inventory was "high instances of Automated Browsing and Manipulated Behavior" detected by White Ops' upgraded algorithm. During this time, White Ops initially insisted that the issue was not the result of Young Hollywood's use of Prodege and then changed their story saying that the issue was indeed Prodege. In mid-October, White Ops informed three SSPs (AT&T Xandr, Beachfront, and Verizon) that it was blocking Young Hollywood's inventory for use of undeclared incentivized traffic. By late January 2020, the White Ops explanation

16

had shifted yet again, and the excuse for blocking Young Hollywood's inventory became bot-generated traffic, *i.e.* non-human traffic.  Most recently, White Ops informed its clients that the YH Websites contain "automated browsing, misleading user interface, and false representation."  To date, Young Hollywood has not received a coherent explanation from White Ops about why it is labeling Young Hollywood's inventory as IVT, nor has White Ops provided evidence to back up their accusations.

82.     Young Hollywood has been running display advertisements for several months, meaning graphic advertisements that appear on the YH Websites as banners and other images, through Facebook, Amazon, and Google.  These display advertisements are running on the exact same pages as the digital advertising opportunities that were being flagged by White Ops.  Yet none of these companies' internal fraud detection systems have flagged the YH Websites as IVT.

83.     Young Hollywood is aware of at least two other media companies that have had similar issues with White Ops.  The companies able to resolve their flagged-traffic issues are those that become White Ops clients.  Those who refuse to "pay up," like Young Hollywood, stay on the White Ops blacklist.

**White Ops' Defamatory Statements**

84.     Beginning in approximately July 2019, White Ops falsely labeled Young Hollywood's advertising space offerings as IVT within reports disseminated to all of its clients.  At least some of those clients, including advertisers, placed the YH Websites on their own blacklists as a result of the White Ops reports.  In addition, White Ops' knowingly and intentionally made false and disparaging statements about Young Hollywood to multiple companies, as described below.

*Beachfront*

85.     In an effort to sell advertising space while its traffic was being blocked on Telaria's platform, Young Hollywood engaged other SSPs.  One of these providers was Beachfront, a video ad management platform for media and advertisers.  Beachfront became a client of White Ops in March 2018.

86.     In September 2019, Young Hollywood attempted to launch with Beachfront.  Shortly thereafter, Beachfront informed Young Hollywood that "100% of [Young Hollywood's] requests [were] currently being blocked by White Ops prebid."  Beachfront explained that Young Hollywood's inventory was being flagged for use of undeclared incentivized traffic.  Beachfront commented that it was "not currently seeing the same issue with any of [its] other publishers."

87.     Beachfront also noted that "companies like BFM [Beachfront] are beholden to these third-party verification companies that are relied upon for metrics across our industry."

*Index Exchange*

88.     Young Hollywood also tried to sell its video advertisements through the global advertising marketplace, Index Exchange, but was unable to do so.  In August 2019, Index Exchange informed Young Hollywood that its websites were on the company's "global blacklist[.]"

89.     Index Exchange explained that this was "an internal blacklist[,]" but "[s]ometimes sites get on the internal blacklist because they are on external blacklists."  Index Exchange has been a client of White Ops since 2017.

*AT&T Xandr*

90.     In October 2019, Young Hollywood attempted to use AT&T's Xandr platform.  AT&T Xandr's subsidiary, AppNexus, is a client of White Ops.

91.     Young Hollywood was unable to sell advertisements through Xandr.  An employee of AT&T Xandr informed Young Hollywood that he believed the problem was that White Ops was blacklisting the YH Websites even though they were not blocked by Xandr's own anti-malvertising tool.

92.     In October 2019, White Ops informed AT&T Xandr that "[a] heavy portion of the traffic [on younghollywood.com] is associated with Incentivized Traffic, which is one of the categories noted in our IVT Taxonomy."

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

93.     In March 2020, AT&T Xandr reported to Young Hollywood that White Ops had "detected Automated Browsing, Misleading User Interface, and False Representation" on younghollywood.com.

*Verizon SSP*

94.     In October 2019, Young Hollywood attempted to partner with Verizon SSP.  Verizon SSP is a client of White Ops.

95.     Verizon SSP informed Young Hollywood that they were hesitant to spend more time working with Young Hollywood because of the White Ops flag.

96.     Simultaneously, another division of the same company, Verizon Media Video Syndication, takes content produced by Young Hollywood and syndicates it across a network of websites in exchange for a percentage of the advertising revenue. Several of the syndicated websites use rewarded traffic, including InstaGC.  Traffic from these websites is not blocked by the fraud verification services used by Verizon Media Video Syndication (DoubleVerify and Integral Ad Science) even though the very same websites are blocked by Verizon SSP (using White Ops).

*Rubicon Project*

97.     In late January 2020, Rubicon Project, a digital advertising infrastructure company, expressed to Young Hollywood that White Ops was reporting "that vast amounts of the traffic you're getting on the site is bot-generated."  Rubicon further explained that "Michael Tiffany [White Ops Co-Founder and President] seems pretty confident that their filtering is accurately classifying [Young Hollywood's] inventory."

*Playbuzz*

98.     Playbuzz (now EX.CO) is a content syndication network.  Playbuzz reached out to Young Hollywood about working together in October 2019.  However, once the content was implemented on the YH Websites, Playbuzz's SSP partners would not approve Young Hollywood due to its status on White Ops' blacklist.

1    99.    Playbuzz reported to Young Hollywood that SSPs Rubicon and Telaria

2  both "said that YoungHollywood.com has been blacklisted due to IVT (invalid

3  traffic.)"

4    *Freestar*

5    100.    In March 2020, Young Hollywood engaged Freestar, a tech company

6  that helps publishers increase revenue by optimizing their advertising operations.

7  Freestar was told by half a dozen different partners that they would not run ads on

8  Younghollywood.com.  Although the companies would not disclose the reason

9  Young Hollywood was rejected, Freestar assumed it was "the whole IVT list from

10  White Ops."

11  **The Impact of White Ops' Conduct on Young Hollywood**

12    101.    White Ops' unlawful activities are irreparably injuring Young

13  Hollywood.  Young Hollywood has incurred severe damage to its reputation based on

14  the false and defamatory statements White Ops communicated in writing and orally to

15  its clients, including SSPs, advertisers, and other media companies regarding Young

16  Hollywood.

17    102.    Without immediate relief, Young Hollywood will go out of business.

18  White Ops' false descriptions have caused Young Hollywood direct loss of millions

19  of dollars in advertising revenue that would have been earned between June 2019 and

20  the date of this filing.  Because advertising is the main source of revenue for the YH

21  Websites, Young Hollywood's ability to generate revenue has all but dried up,

22  making it impossible for the company to create new content and pushing the business

23  to the brink of collapse.  Young Hollywood has been forced to shut down its

24  production studio, cease creating video content, and lay off all of its employees

25  involved in the production of content.

26    103.    White Ops' conduct and the resulting harm caused to Young Hollywood

27  will continue unless and until halted by this Court.  Young Hollywood seeks

28

preliminary and permanent injunctive relief, corrective advertising, damages,

punitive damages based on willful conduct, reasonable attorneys' fees, and costs.

## COUNT I

### DEFAMATION IN VIOLATION OF CAL. CIV. CODE §§ 45-46

104.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

105.   White Ops intentionally and falsely stated in writing and in oral communications that Young Hollywood's advertising space inventory constitutes IVT.

106.   Beginning in approximately July 2019, White Ops falsely labeled the inventory on the YH Websites as containing exclusively IVT within reports disseminated to all of White Ops' clients.  Further, White Ops intentionally and explicitly informed Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, that Young Hollywood's inventory is IVT.

107.   White Ops lacked a reasonable belief in the truth of these statements.

108.   White Ops made these false statements in order to pressure Young Hollywood into becoming its client and paying for White Ops' fraud detection services.

109.   As a result of White Ops' false statements, Young Hollywood has suffered injury to its reputation as a digital media provider and lost substantial advertising revenue in an amount to be proved at trial.

## COUNT II

### TRADE LIBEL

110.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

111.   Through its actions described above, White Ops committed trade libel. White Ops intentionally and falsely stated in writing that Young Hollywood's advertising space inventory constitutes IVT.

112.   Beginning in approximately July 2019, White Ops falsely labeled the inventory on the YH Websites as containing exclusively IVT within reports disseminated to all of White Ops' clients.  Further, White Ops intentionally and explicitly informed Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, that Young Hollywood's inventory is IVT.

113.   White Ops lacked a reasonable belief in the truth of these statements.

114.   White Ops made these false statements in order to pressure Young Hollywood into becoming its client and paying for White Ops' fraud detection services.

115.   White Ops' false statements induced existing and potential customers to avoid purchasing Young Hollywood's inventory.

116.   As a result of White Ops' false statements, Young Hollywood has suffered injury to the reputation of the YH Websites and lost substantial revenue in an amount to be proved at trial.

## <u>COUNT III</u>

## **PRODUCT DISPARAGEMENT IN VIOLATION OF (15 U.S.C. § 1125(a)(1)(B))**

117.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

118.   White Ops deceives its customers by touting the ability of its fraud detection services to differentiate between human and bot traffic, when in fact, White Ops is unable to differentiate between bot traffic and rewarded human traffic.

119.   White Ops affirmatively and falsely stated in writing within reports periodically disseminated to all of its over 200 clients, including Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, that Young Hollywood's inventory is IVT.  By sending reports to its clients nationwide, White Ops caused its false statements to enter interstate commerce.

120.   The statements actually deceived or have the tendency to deceive a substantial segment of its audience with respect to Young Hollywood, the YH Websites, and its entire inventory.  Further, the deception is material, in that it is likely to, and in fact has, influenced purchasing decisions of the relevant purchasing public. The relevant purchasing public is comprised of SSPs, advertising purchasers, and others who use White Ops' fraud detection services.  Various existing and prospective customers have refused to purchase Young Hollywood's advertising space or do business with Young Hollywood as a result of White Ops' false statements.

121.   Young Hollywood has suffered injury to the goodwill associated with its products and a diversion of its advertising sales in an amount to be determined at trial.

## COUNT IV

## UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *et seq*.

122.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

123.   White Ops has affirmatively and falsely stated orally and in writing within its reports disseminated to all of its over 200 clients, including Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, that Young Hollywood inventory is IVT.  White Ops blacklisted Young Hollywood, blocking its ad requests from appearing on the Telaria platform and ultimately from being seen and bid on by advertisers.

124.   White Ops' conduct constitutes unfair, unlawful and/or fraudulent business practices that have injured and will continue to injure Young Hollywood's business in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*.  Specifically, and as described above, White Ops' conduct constitutes defamation, trade libel, and product disparagement under the Lanham Act.

125.   As a direct, proximate, and foreseeable result of Defendant's wrongful conduct as alleged above, Defendant's business acts and practices have caused injury to Young Hollywood.

126.   Defendant's acts have caused and will continue to cause irreparable injury to Young Hollywood and its business and reputation, unless and until Defendant is permanently enjoined.

127.   Young Hollywood has been harmed and has lost money and property as a result of White Ops' conduct and requests an order of restitution against White Ops.

<u>COUNT V</u>

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

128.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

129.   Young Hollywood has developed valuable contractual and other business and economic relationships with supply-side platforms, including Telaria, through which Young Hollywood sells its inventory to advertisers, with the probability of future economic benefit.  Additionally, Young Hollywood has developed valuable business and economic relationships with third parties, including Prodege and advertisers, that have engaged in, engage in, are scheduled to engage in, or may engage in collaborations, projects, or other business dealings with Young Hollywood, with a probability of future economic benefit.

130.   White Ops knows and at all relevant times knew of these contractual and other business and economic relationships between Young Hollywood and its advertising partners, including Telaria, and Prodege.  White Ops also knew of the business and economic relationships between Young Hollywood and other third parties, such as advertisers who purchase advertisements through the Telaria platform and have engaged in, engage in, are scheduled to engage in, or may engage in collaborations, projects, or other business dealings with Young Hollywood.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

131.   White Ops has engaged in unlawful, unethical, and wrongful conduct by affirmatively and falsely categorizing Young Hollywood's inventory as IVT, thereby preventing its ad requests from appearing on the Telaria platform or being seen by advertisers; and by disseminating orally and/or in writing to its clients, including Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, the false claim that Young Hollywood's inventory is IVT.

132.   White Ops knew its conduct was substantially certain to interfere with Young Hollywood's economic interest, namely its ability to sell advertisements, and White Ops acted knowingly and intentionally and with reckless disregard of the foreseeable consequences of its actions.

133.   White Ops' unlawful and unethical conduct caused certain of Young Hollywood's advertising partners, including SSPs and advertisers, to cease or curtail their relationships with Young Hollywood.  Young Hollywood's contractual and other business and economic relationships with these third parties have and continue to be disrupted by White Ops' conduct.

134.   White Ops' conduct is and was wrongful, independent of any interference with the business and economic relationships discussed here, because among other things, it constitutes defamation, trade libel, and product disparagement under the Lanham Act.

135.   As a result of White Ops' conduct, which disrupted Young Hollywood's business relationships, Young Hollywood has suffered injury to its reputation and lost substantial revenue in an amount to be proved at trial.

<u>COUNT VI</u>

**NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

136.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

25

137.   Young Hollywood has developed valuable contractual and other business and economic relationships with supply-side platforms, including Telaria, through which Young Hollywood sells its inventory to advertisers, with the probability of future economic benefit.  Additionally, Young Hollywood has developed valuable business and economic relationships with third parties, including Prodege and advertisers, that have engaged in, engage in, are scheduled to engage in, or may engage in collaborations, projects, or other business dealings with Young Hollywood, with a probability of future economic benefit.

138.   White Ops knows and at all relevant times knew of these contractual and other business and economic relationships between Young Hollywood and its advertising partners, including Telaria, and Prodege.  White Ops also knew of the business and economic relationships between Young Hollywood and other third parties, such as advertisers who purchase advertisements through the Telaria platform and have engaged in, engage in, are scheduled to engage in, or may engage in collaborations, projects, or other business dealings with Young Hollywood.

139.   White Ops has engaged in unlawful, unethical, and wrongful conduct by affirmatively and falsely categorizing Young Hollywood's inventory as IVT, thereby preventing its ad requests from appearing on the Telaria platform or being seen by advertisers; and by disseminating orally and/or in writing to all of its clients, including Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, the false claim that Young Hollywood's inventory is IVT.

140.   White Ops knew or should have known that a failure to act with due care would disrupt Young Hollywood's relationships with its ad partners, third parties, and advertisers.

141.   White Ops owed Young Hollywood a duty of care, since White Ops knew or should have known of Young Hollywood's relationships with its advertising partners, third parties, and advertisers, and White Ops knew or should have known that its failure to act with due care would disrupt that relationship.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

142.   White Ops owes a duty of care to Young Hollywood because a special relationship exists between the two parties.  First, White Ops' actions in informing its clients that Young Hollywood's inventory was IVT, and creating and disseminating its blacklist, were intended to influence its clients' purchasing decisions and advertising approaches with respect to Young Hollywood.  Second, the injury to Young Hollywood from White Ops' improper classification was foreseeable and certain.  Third, White Ops' conduct was a direct cause of Young Hollywood's injury.

143.   White Ops' conduct is and was wrongful, independent of any interference with the business and economic relationships discussed here, because it constitutes defamation, trade libel, and product disparagement under the Lanham Act.

144.   Young Hollywood's contractual and other business and economic relationships with its advertising partners, advertisers, and other third parties have and continue to be disrupted by White Ops' conduct.

145.   As a result of White Ops' conduct, Young Hollywood has suffered injury to its reputation and lost substantial revenue in an amount to be proved at trial.

## COUNT VII

**FALSE ADVERTISING IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17500, *et seq*.**

146.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

147.   White Ops deceived its customers by touting the ability of its fraud detection services to differentiate between human and bot traffic, when in fact, White Ops is unable to differentiate between bot traffic and rewarded human traffic.

148.   White Ops affirmatively and falsely stated in writing within reports periodically disseminated to its clients, including Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, that Young Hollywood's inventory is IVT.

149.   White Ops' conduct and statements concerning the YH Websites constitute the dissemination of untrue and misleading statements, which White Ops knows, or should have known by the exercise of reasonable care, are untrue or misleading.

150.   White Ops' conduct as described above is in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

151.   As a direct and proximate result of Defendant's conduct, Young Hollywood has suffered injury and has lost revenue as a result of such untrue or misleading statements, causing damage to Young Hollywood in an amount to be determined at trial.

152.   White Ops' acts have caused, and will continue to cause, irreparable injury to Young Hollywood and its business and reputation unless and until Defendant is permanently enjoined.

<u>**COUNT VIII**</u>

**NEGLIGENCE**

153.   Young Hollywood repeats and realleges every allegation contained in paragraphs 1-103 as though fully set forth here.

154.   White Ops owes a duty of care to Young Hollywood because a special relationship exists between the two parties.  First, White Ops' actions in informing its clients that Young Hollywood's inventory was IVT, and creating and disseminating its blacklist, were intended to influence its clients' purchasing decisions and advertising approaches with respect to Young Hollywood.  Second, the injury to Young Hollywood from White Ops' improper classification was foreseeable and certain: classifying the YH Websites as IVT prevents any of Young Hollywood's advertisement requests from being seen by advertisers.  Third, White Ops' conduct was a direct cause of Young Hollywood's injury, and White Ops is therefore responsible for Young Hollywood's injuries.  Fourth, public policy favors preventing

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

future harm from the reckless conduct of fraud verification companies like White Ops.

155.   White Ops also owed a duty of care to Young Hollywood because its affirmative actions established a duty.  White Ops undertook affirmative action affecting Young Hollywood's interests by monitoring the YH Websites, classifying them as IVT, and disseminating this false information to its clients.

156.   White Ops knew or should have known of Young Hollywood's relationships with its advertising partners, third parties, and advertisers, and White Ops knew or should have known that its failure to act with due care would disrupt those relationship.

157.   White Op's breached its duty of care to Young Hollywood by affirmatively and falsely categorizing Young Hollywood's inventory as IVT, thereby preventing its ad requests from appearing on the Telaria platform or being seen by advertisers; and by disseminating orally and/or in writing to all of its over 200 clients, including Telaria, Prodege, Beachfront, AT&T Xandr, Index Exchange, Verizon SSP, and Rubicon, the false claim that Young Hollywood's inventory is IVT.

158.   As a direct and proximate result of White Ops' conduct, Young Hollywood has suffered injury to its reputation and lost substantial revenue in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Young Hollywood prays for judgment as follows:

1.      directing White Ops to restore the YH Websites to the position they were in before White Ops changed its algorithm in late June 2019;

2.      preliminarily and permanently enjoining White Ops, its officers, agents, servants, employees, representatives, successors, and assigns, and all persons or entities acting in concert or participation with any or all of them, from including the YH Websites on White Ops' blacklist circulated to its customers;

3.      directing that White Ops publish notices to all of its clients advising them that it had incorrectly and improperly categorized traffic to the YH Websites as IVT;

4.      directing that White Ops be required to file with the Court and serve on Young Hollywood, within ten (10) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which it complied with the injunction;

5.      directing that White Ops pay Young Hollywood such damages as it has sustained as a consequence of Defendant's wrongful conduct, with the precise amount to be determined at trial;

6.      directing that White Ops pay Young Hollywood restitution, in an amount to be determined at trial;

7.      directing that White Ops pay Young Hollywood punitive damages, in an amount to be determined at trial, as a result of Defendant's malicious, wanton and/or oppressive conduct pursuant to Cal. Civ. Code § 3294;

8.      directing that White Ops pay Young Hollywood's costs, attorneys' fees, and expenses in this suit under Cal. Bus. & Prof. Code §§ 14247 and 14250 and because this is an "exceptional case" under Section 35 of the Lanham Act, 15 U.S.C. § 1117;

9.      directing that White Ops pay Young Hollywood pre- and post-judgment interest; and

10.     granting Young Hollywood such other and further relief as the Court may deem just and proper.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

DATED:  April 9, 2020

Brendan J. O'Rourke
Jonathan Weiss
Lee Popkin
Simona Weil
PROSKAUER ROSE LLP

*/s/ Jonathan Weiss*

Attorneys for Plaintiff,
Young Hollywood LLC

31

1
2

## **DEMAND FOR JURY TRIAL**

Plaintiff Young Hollywood LLC demands a trial by jury.

3
4   DATED:  April 9, 2020                          Brendan J. O'Rourke
5                                                  Jonathan Weiss
                                                   Lee Popkin
6                                                  Simona Weil
                                                   PROSKAUER ROSE LLP
7
8                                                  */s/ Jonathan Weiss*
9
10                                                 Attorneys for Plaintiff,
                                                   Young Hollywood LLC
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28