Brendan J. O'Rourke (admitted *pro hac vice*)
borourke@proskauer.com
Jonathan M. Weiss, SBN 250307
jweiss@proskauer.com
Lee Popkin (admitted *pro hac vice*)
lpopkin@proskauer.com
Simona Weil, SBN 316449
sweil@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, 24th Floor
Los Angeles, CA  90067-3010
Telephone:    (310) 557-2900
Facsimile:    (310) 557-2193

Attorneys for Plaintiff Young Hollywood LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| YOUNG HOLLYWOOD LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>WHITE OPS, INC., a Delaware corporation,<br><br>                    Defendant. | Case No. 2:20-cv-3334 PA (RAOx)<br><br>**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT** |

---

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................. 2

    A.    Young Hollywood and the YH Websites ................................. 2

    B.    White Ops .................................................................................. 3

    C.    White Ops Illegally Classifies Young Hollywood as IVT .................. 4

    D.    Young Hollywood, Prodege, and Telaria Try to Get Answers ........... 4

    E.    White Ops' Defamatory Statements ........................................ 5

    F.    The Consequences of White Ops' Unlawful Conduct........................ 8

III.  LEGAL STANDARD ........................................................................ 9

IV.  ARGUMENT .................................................................................... 9

    A.    The FAC States a Claim for Defamation (Count I)............................. 9

        1.    The FAC adequately alleges the substance of White Ops' defamatory statements ........................................ 9

        2.    White Ops' defamatory statements disparage Young Hollywood ...................................................... 12

    B.    The FAC States a Claim for Product Disparagement in Violation of the Lanham Act (Count III) ............................ 14

        1.    Young Hollywood sufficiently alleged White Ops' misleading representations ........................................ 14

        2.    White Ops' false statements constitute commercial promotion under the Lanham Act............................. 16

            a.    White Ops' false statements are commercial speech ..... 16

            b.    Young Hollywood adequately alleged dissemination of the false statements ........................... 18

    C.    The FAC States a Claim for Intentional and Negligent Interference with Prospective Business Advantage (Counts V and VI) ........................................................ 20

        1.    The FAC sufficiently identifies the relationships with which White Ops interfered............................. 20

        2.    The FAC sufficiently alleges White Ops' knowledge of Young Hollywood's relationships............................. 22

i

3.      The FAC sufficiently alleges that White Ops took action to disrupt Young Hollywood's relationship with Index Exchange..................................................................................24

V.      CONCLUSION ...............................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alfasigma USA, Inc. v. First Databank, Inc.*,
  398 F. Supp. 3d 578 (N.D. Cal. 2019).................................................................17

*Am. Acad. of Pain Mgmt. v. Joseph*,
  353 F.3d 1099 (9th Cir. 2004) ...............................................................16, 17

*Ariix, LLC v. NutriSearch Corp.*,
  2018 WL 1456928 (S.D. Cal. Mar. 23, 2018) ......................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................9, 13

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .....................................................................................9

*Bolger v. Youngs Drug Prod. Corp.*,
  463 U.S. 60 (1983) ............................................................................17, 18

*Bragel Int'l, Inc. v. Kohl's Dep't Stores, Inc.*,
  2018 WL 5858535 (C.D. Cal. June 5, 2018)........................................15

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
  16 F. Supp. 3d 1141 (S.D. Cal. 2014) ..................................................25

*Coastal Abstract Serv. v. First American Title*,
  173 F.3d 725 (9th Cir. 1999)..................................................................19

*Code Rebel, LLC v. Aqua Connect, Inc.*,
  2013 WL 5405706 (C.D. Cal. Sept. 24, 2013).....................................25

*Dynamic v. Blossom Footwear, Inc.*,
  2009 WL 10674326 (C.D. Cal. Apr. 28, 2009).....................................18

*G.U.E. Tech, LLC v. Panasonic Avionics Corp.*,
  2016 WL 6138422 (C.D. Cal. Feb. 4, 2016)...................................17, 22

*Genus Lifesciences Inc. v. Lannett Co., Inc.*,
  378 F. Supp. 3d 823 (N.D. Cal. 2019), *reconsideration denied*, 2019
  WL 4168958 (N.D. Cal. Sept. 3, 2019)..................................................17

iii

*Gonzalez v. Allstate Ins. Co.*,
  2005 WL 5891935 (C.D. Cal. Aug. 2, 2005) .......................................... 16, 17, 19

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
  394 F. Supp. 3d 1073 (C.D. Cal. 2019) ................................................. 18

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
  12 F. Supp. 2d 1035 (C.D. Cal. 1998) ................................................. 13

*Johnson & Johnson v. Carter-Wallace, Inc.*,
  631 F.2d 186 (2d Cir. 1980) ................................................................. 14

*Kilopass Tech. Inc. v. Sidense Corp.*,
  2010 WL 5141843 (N.D. Cal. Dec. 13, 2010) ...................................... 14

*Logisticare Sols., LLC v. Cal. Med. Transp. Ass'n, Inc.*,
  2018 WL 5099663 (C.D. Cal. May 21, 2018) ........................................ 17

*LuxPro Corp. v. Apple Inc.*,
  2011 WL 1086027 (N.D. Cal. Mar. 24, 2011) ................................... 11, 12

*Maponics, LLC v. Wahl*,
  2008 WL 2788282 (N.D. Cal. July 18, 2008) ........................................ 12

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ......................................................... 18, 19

*Norsat Int'l, Inc. v. B.I.P. Corp.*,
  2013 WL 5530771 (S.D. Cal. Oct. 3, 2013) .......................................... 11

*Parravano v. Babbitt*,
  861 F. Supp. 914 (N.D. Cal. 1994) ....................................................... 24

*PAX Water Techs., Inc. v. Medora Corp.*,
  2019 WL 4390567 (C.D. Cal. Aug. 5, 2019) ........................................ 16

*ProSolutions Software, Inc. v. DemandForce, Inc.*,
  2013 WL 12139120 (C.D. Cal. Mar. 7, 2013) ...................................... 15

*RingCentral, Inc. v. Nextiva, Inc.*,
  2020 WL 2065701 (N.D. Cal. Apr. 29, 2020) ...................................... 12

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
  983 F. Supp. 1303 (N.D. Cal. 1997) ................................................. 20, 21

iv

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST
AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

*Starbuzz Tobacco, Inc. v. Abdallah*,
  2011 WL 13214313 (C.D. Cal. Nov. 2, 2011) .................................................... 13

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .............................................................................. 9

*Vidillion, Inc. v. Pixalate, Inc.*,
  2019 WL 3308768 (C.D. Cal. June 5, 2019) ................................................. 17, 19

**STATE CASES**

*Keene v. Lake Publ'g Co.*,
  2010 WL 985849 (Cal. Ct. App. Mar. 18, 2010) ............................................... 13

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ....................................................................................... 22

*Polygram Records, Inc. v. Superior Court*,
  170 Cal. App. 3d 543 (1985) .......................................................................... 12, 13

**RULES**

Federal Rules of Civil Procedure
  Rule 9(b) ............................................................................................................... 14
  Rule 15 .................................................................................................................... 9

v

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

1  **I.    __INTRODUCTION__**

2          Since late June 2019, White Ops, a cybersecurity company that claims to

3  provide fraud detection services, has been falsely classifying Young Hollywood's

4  entire advertising space inventory as invalid traffic ("IVT"), preventing Young

5  Hollywood from selling advertisements, and thereby cutting off its ability to

6  generate revenue. As a result of White Ops' false statements and Young

7  Hollywood's decision not to become a paying White Ops client, Young Hollywood

8  has been unable to sell video advertisement space to its clients of many years, the

9  company's reputation as a digital media provider has been ruined, and the business

10 is on the brink of collapse. Young Hollywood asserts claims for (1) defamation, (2)

11 trade libel, (3) product disparagement in violation of the Lanham Act, (4) unfair

12 competition, (5) intentional interference with prospective economic advantage, (6)

13 negligent interference with prospective economic advantage, and (7) negligence.

14         Tellingly, though White Ops' complains of Young Hollywood's "kitchen

15 sink" approach to pleading, it moved to dismiss only Young Hollywood's claims for

16 defamation (Count 1), product disparagement (Count 3), and a portion of the

17 intentional and negligent interference claims (Counts 5 and 6). Because these

18 claims, like the others in the First Amended Complaint ("FAC"), are adequately

19 pleaded, White Ops' motion should be denied.

20         First, Young Hollywood has stated a claim for defamation. The FAC

21 sufficiently alleges the substance of dozens of defamatory statements made by

22 White Ops, including the false statement that traffic to Young Hollywood's websites

23 is IVT. These allegations have since been corroborated by documents produced in

24 discovery by White Ops. White Ops' false statements suggest that Young

25 Hollywood is selling fraudulent traffic to advertisers and is otherwise associated

26 with fraud, calling into question the integrity of Young Hollywood as a business.

27 The statements are therefore actionable as defamation.

28

1

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST
AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

Second, the FAC states a claim for product disparagement in violation of the Lanham Act. White Ops' false representations qualify as "commercial advertising or promotion" under the Act. The statements are commercial speech because White Ops had a commercial motive for making the statements and the statements concerned Young Hollywood and its goods and services. Young Hollywood also adequately pleaded that the misrepresentations were disseminated to the relevant purchasing public, which here is comprised of SSPs, technology platforms that facilitate sales of online advertising, and other clients of White Ops.

Third, the FAC adequately states a claim for intentional and negligent interference with prospective business advantage. Young Hollywood identified the specific relationships with which White Ops interfered, including Telaria, Prodege, Beachfront, Xandr, Index Exchange, Verizon SSP, and Rubicon. Further, Young Hollywood pleaded sufficient facts to show White Ops' knowledge of these relationships and the specific actions it took to interfere with them.

## II.    STATEMENT OF FACTS

### A.    Young Hollywood and the YH Websites

Young Hollywood is a publisher and distributer of original premium celebrity and lifestyle content. FAC ¶ 13. The company operates several platforms, including www.younghollywood.com and www.younghollywoodtv.com (the "YH Websites"). *Id*. at ¶ 14. Young Hollywood has invested tens of millions in developing its brand, cultivating at its peak an audience of over 10 million followers on social media and over 300 million monthly user interactions. *Id*. at ¶ 17.

Young Hollywood's revenue is derived exclusively from advertising and licensing. FAC ¶ 18. Hundreds of high-profile advertisers buy Young Hollywood's inventory, including Coca-Cola, Subway, and Unilever. *Id*. Young Hollywood has grown its revenue exponentially since inception until June 2019, when, as described below, White Ops falsely classified its inventory as IVT. *Id* at ¶ 19.

2

Young Hollywood has worked with Telaria, Inc., a supply-side platform that monetizes premium video advertising inventory, since 2008. FAC ¶ 20. Telaria's SSP utilizes programmatic advertising—the automated buying and selling of online advertising. *Id*. at ¶ 22. This means that the advertising space available before a video is played on YH Websites (pre-roll) is sold through an automated bidding process on Telaria's online marketplace. *Id*.

Beginning in March 2015, Young Hollywood began to work with Prodege, a consumer engagement and online marketing company, to market Young Hollywood content and drive traffic to the YH Websites. FAC ¶ 23.

### B.   White Ops

White Ops is a cybersecurity company that claims to provide fraud detection services through the use of proprietary software and algorithms. FAC ¶ 29. The company's over 200 customers pay a monthly subscription fee in exchange for White Ops' services. *Id*. at ¶ 30. One service White Ops offers is "MediaGuard pre-bid prevention API," a "pre-bid filter" intended to prevent fraud before a publisher's advertising inventory is offered to advertisers for bidding on the SSP's platform. *Id*. at ¶ 32. As a sophisticated party in the digital advertising landscape, White Ops understands how SSP platforms work and is familiar with the relationship between publishers, advertisers, and SSPs in these marketplaces. *Id*. at ¶ 43.

White Ops customers have access to a customer dashboard where they are able to view the results of White Ops' filtering. FAC ¶¶ 36, 139. White Ops also maintains a "blacklist/blocklist" of domains associated with fraud. *Id*. at ¶ 35. White Ops distributes information regarding these blacklisted domains to its clients. *Id*. The reports and dashboards demonstrate the utility of White Ops' fraud detection capabilities and encourage clients to continue subscribing to its services. *Id*.

One way White Ops generates business is by using its IVT findings to induce companies to subscribe to its services. FAC ¶ 88. When a flagged company becomes

3

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

a White Ops client, it is "able to resolve [its] flagged-traffic issues[.]" *Id.* Companies "who refuse to 'pay up,' . . . stay on the White Ops blacklist." *Id.*

### C.   White Ops Illegally Classifies Young Hollywood as IVT

Beginning in late June 2019, White Ops began classifying a significant portion of Young Hollywood's traffic as IVT and blocking its inventory from Telaria's exchange. FAC ¶ 44. By June 28, 2019, Telaria was rejecting 65 to 70 percent of Young Hollywood's advertising space offerings due to the White Ops pre-bid filter. *Id.* at ¶¶ 39, 45. In other words, 65 to 70 percent of the offerings Young Hollywood sought to sell were suddenly not being shown to advertisers. *Id.* at ¶ 45. Telaria sent Young Hollywood an email explaining: "White Ops just upgraded their algorithms to account for behavior they have been tracking that most closely aligns with high instances of Automated Browsing and Manipulated Behavior within the IVT (Invalid Traffic) Taxonomy. Since we use White Ops for pre-bid IVT filtering, you may see instances of increased request filtering on your supply[.]" *Id.* at ¶ 46. In addition to this increased filtering, the YH Websites were placed on White Ops' blacklist/blocklist. *Id.* at ¶ 47. White Ops circulated the blacklist/blocklist containing the YH Websites to Verizon, Xandr, Beachfront, and Telaria. *Id.* at ¶ 48. By July 2, 2019, White Ops was blocking "99% of traffic across all [Young Hollywood] sites" as IVT. *Id.* at ¶ 49.

Young Hollywood's revenue from the Telaria platform fell by over 99% from June to July 2019. *Id.* By September, this revenue stream totaled $12. *Id.* at ¶ 50.

### D.   Young Hollywood, Prodege, and Telaria Try to Get Answers

As soon as Young Hollywood became aware that White Ops was blocking its inventory, it did everything possible to resolve the problem. FAC ¶ 53. For months, White Ops repeatedly led Young Hollywood to believe it was working diligently toward a solution when, in fact, it was not. *Id.* at 54-63. Prodege and Telaria also asked White Ops to investigate Young Hollywood's blocked traffic. *Id.* at ¶ 64. In response to one of these inquiries, White Ops informed Prodege on July 3, 2019 that

4

1   its "team confirmed the traffic [on the YH Websites] for having high instances of

2   Automated Browsing and Manipulated Behavior." *Id*. at ¶ 65. Prodege noted the

3   White Ops algorithm change had "negatively impacted several clients[,]" but "only

4   YoungHollywood was put on a . . . 'death penalty' list where the site cannot

5   monetize at all." *Id*. Prodege followed-up with White Ops multiple times, but White

6   Ops did not provide further explanation and continued to blacklist Young

7   Hollywood. *Id*. at ¶¶ 67-68.

8       E.    **White Ops' Defamatory Statements**

9       Beginning in approximately July 2019, White Ops falsely labeled Young

10  Hollywood's advertising space inventory as IVT within reports disseminated to all

11  of its clients. FAC ¶¶ 89, 126, 139. At least some of those clients, including

12  advertisers, placed the YH Websites on their own internal blacklists because of the

13  White Ops reports. *Id*. In addition, White Ops intentionally and explicitly informed

14  Telaria, Prodege, Beachfront, Xandr, Index Exchange, Verizon SSP, and Rubicon,

15  that Young Hollywood's inventory is IVT. *Id* at ¶¶ 84-86, 126, 139. White Ops'

16  false statements suggest that the YH Websites do not have real human traffic and

17  that the company is trying to sell fraudulent traffic to advertisers. *Id*. at ¶ 125. Such

18  allegations disparage the integrity of the Young Hollywood brand and the goods it

19  offers for sale (advertising space for human viewers). *Id*. White Ops' false and

20  disparaging statements about Young Hollywood are further described below.

21      **Beachfront**. In an effort to sell advertising space while its traffic was being

22  blocked on Telaria's platform, Young Hollywood engaged other SSPs. FAC ¶ 90.

23  One of these providers was Beachfront, a video ad management platform for media

24  and advertisers. *Id*. In September 2019, Young Hollywood tried to launch with

25  Beachfront, but because of White Ops' unlawful actions, it was not able to

26  do so. *Id*. at ¶ 91-95. Beachfront, a White Ops client, informed Young Hollywood

27  that "100% of [its] requests [were] currently being blocked by White Ops prebid"

28  due to undeclared incentivized traffic. *Id*. at ¶ 92. Beachfront confirmed it was "not

5

currently seeing the same issue with any of [its] other publishers." *Id*. Beachfront noted that companies like Beachfront "are beholden to these third-party verification companies that are relied upon for metrics across our industry." *Id*. at ¶ 93.

**Index Exchange**. Young Hollywood also tried to sell its video advertisements through the global advertising marketplace, Index Exchange, but was unable to do so. FAC ¶ 96. Index Exchange became a client of White Ops in 2017. *Id.* ¶ 97. After White Ops placed the YH Websites on its blacklist in late June 2019, Index Exchange, in turn, placed the YH Websites on "the company's 'global blacklist'" which can occur when websites are on an "external blacklist[.]" *Id*. at ¶¶ 48, 96-97.

White Ops had knowledge of Young Hollywood's relationship with Index Exchange as a result of the inquiries Index Exchange made regarding the YH Websites through MediaGuard. FAC at ¶ 98.

**AT&T Xandr**. In October 2019, Young Hollywood entered into an agreement to sell advertising on the Xandr platform. FAC at ¶ 99. Young Hollywood, however, has been unable to sell pre-roll advertisements through Xandr. *Id*. at ¶ 100.  Xandr's subsidiary, AppNexus, is a client of White Ops. *Id.* at ¶ 99.

In October 2019, White Ops informed Xandr that "[a] heavy portion of the traffic [on younghollywood.com] is associated with Incentivized Traffic[.]" FAC ¶ 101. In March 2020, Xandr reported to Young Hollywood that White Ops had "detected Automated Browsing, Misleading User Interface, and False Representation" on the YH Websites. *Id*. at ¶ 102. In May 2020, Xandr informed Young Hollywood that the bulk of the advertising inventory on the YH Websites was being filtered by White Ops. *Id*. at ¶ 104. As late as June 2020, 90% of pre-roll advertising inventory, i.e. the advertising space available before a video is played on YH Websites, was being blocked by White Ops on the Xandr platform. *Id*.

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

An employee of Xandr informed Young Hollywood that he believed the problem was White Ops blacklisting the YH Websites even though they were not blocked by Xandr's own anti-malvertising tool. FAC ¶ 100.

**Verizon SSP**. In October 2019, Young Hollywood attempted to partner with Verizon SSP in order to sell its advertising inventory from the YH Websites on the Verizon SSP platform. FAC ¶ 106. Verizon SSP is a client of White Ops. *Id*. at ¶ 105. In July 2019, White Ops informed Verizon SSP that the traffic on the YH Websites was IVT. *Id*. Before Young Hollywood could begin selling its inventory, Verizon SSP informed Young Hollywood that they were hesitant to spend more time working with Young Hollywood because of the White Ops flag and the relationship collapsed. *Id*. at ¶ 106-07.

**Rubicon Project**. Young Hollywood also entered into talks with Rubicon Project, a digital advertising infrastructure company, to sell the YH Websites' inventory on the Rubicon exchange. FAC ¶ 109. In late January 2020, Rubicon expressed to Young Hollywood that White Ops was reporting "that vast amounts of the traffic you're getting on the site is bot-generated." *Id*. at ¶ 110. Rubicon further explained that "Michael Tiffany [White Ops' President] seems pretty confident that their filtering is accurately classifying [Young Hollywood's] inventory." *Id*.

**Playbuzz**. Playbuzz (now EX.CO) is a content syndication network. FAC ¶ 112. Playbuzz reached out to Young Hollywood about working together in October 2019. *Id*. However, once the content was implemented on the YH Websites, Playbuzz's SSP partners would not approve Young Hollywood due to its status on White Ops' blacklist. *Id*. According to Playbuzz, SSPs Rubicon and Telaria both "said that YoungHollywood.com has been blacklisted due to IVT[.]" *Id*. at ¶ 113.

**Freestar**. In March 2020, Young Hollywood engaged Freestar, a tech company that helps publishers increase revenue by optimizing their advertising operations. FAC ¶ 114. Half a dozen partners informed Freestar that they would not run ads on Younghollywood.com. *Id*. Freestar assumed it was "the whole IVT list

7

---

from White Ops." *Id*. Freestar ended its relationship with Young Hollywood after having "exhausted all [their] efforts in trying to help resolve these [White Ops] tech issues[,]" noting that "a few of us think" it may be a "a pay-to-play situation with them [White Ops.]" *Id*. at ¶¶ 115-116.

### F.   The Consequences of White Ops' Unlawful Conduct

By falsely accusing Young Hollywood of high instances of automated browsing and manipulated behavior, classifying the YH Websites as IVT, and blacklisting Young Hollywood, White Ops directly impacted Young Hollywood's ability to sell to advertisers and caused Young Hollywood to lose millions of dollars in advertising revenue that would have been earned between June 2019 and June 2020. FAC ¶¶ 51, 122, 143. Young Hollywood has been forced to shut down its production studio, cease creating video content, and lay off all employees involved in content production. *Id*. at ¶ 122.

White Ops' actions have also caused harm to Young Hollywood's reputation as a digital media provider. FAC ¶¶ 52, 118. By branding traffic to the YH Websites as IVT, White Ops made false, negative statements about the character and nature of Young Hollywood's goods and brand and its integrity as a business. *Id*.

Because of the false information White Ops disseminated, Young Hollywood had to end its four-year relationship with Prodege. FAC ¶ 69. On May 19, 2020, Telaria also ended its more than decade-long relationship with Young Hollywood after it was unsuccessful in "help[ing] remove [the White Ops] blocks[.]" *Id*. at ¶ 119. Young Hollywood has been forced to search for other providers, and White Ops' conduct has prevented Young Hollywood from realizing many of these relationships as well. *Id*. at ¶¶ 90-117.

White Ops' unlawful conduct has also caused massive diminution in value of a company that investment bankers valued between 100 and 400 million dollars in 2015 and 2016, before a period of exponential growth for the company. FAC ¶ 19.

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

## III.  **LEGAL STANDARD**

In addressing White Ops' Motion to Dismiss, the Court must determine whether the factual allegations in the FAC, taken as true and together with all reasonable inferences, state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Young Hollywood's FAC need only contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Should the Court conclude that any claims need correction, "[l]eave to amend . . . should be granted unless the pleading 'could not possibly be cured' by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016) (internal citation omitted); *see* Fed. R. Civ. P. 15.

## IV.  **ARGUMENT**

### A.  **The FAC States a Claim for Defamation (Count I)**

#### 1.  **The FAC adequately alleges the substance of White Ops' defamatory statements**

White Ops' arguments to dismiss Young Hollywood's claim for defamation fail. First, White Ops maintains that Young Hollywood "failed to identify the substance of the specific statements it contends are defamatory." Motion at 6. This is demonstrably false. The FAC recounts dozens of specific defamatory statements made by White Ops:

- White Ops "maintains a 'blacklist' of domains associated with fraud." FAC ¶ 35. White Ops placed "the YH Websites" on this "blacklist/blocklist" and circulated the list to "Verizon, Xandr, Beachront, and Telaria." *Id.* at ¶ 47-48.

- "White Ops informed Prodege on July 3, 2019 that its 'team confirmed the traffic [on the YH Websites] for having high instances of Automated Browsing and Manipulated Behavior.'" FAC ¶ 65.

9

- "White Ops, in late January 2020, was still flagging Young Hollywood's inventory on the Telaria platform 'for automated browsing/bots and other mechanisms[.]'" FAC ¶ 80.
- "In mid-October, White Ops informed three SSPs (AT&T Xandr, Beachfront, and Verizon) that it was blocking Young Hollywood's inventory for use of undeclared incentivized traffic." FAC ¶ 84.
- ". . .White Ops informed its clients that the YH Websites contain 'automated browsing, misleading user interface, and false representation.'" FAC ¶ 86.
- "Beachfront informed Young Hollywood that '100% of [Young Hollywood's] requests [were] currently being blocked by White Ops prebid.'" Beachfront explained that Young Hollywood's inventory was being flagged for use of undeclared incentivized traffic." FAC ¶ 92. "Indeed, in October 2019, in response to an inquiry from Beachfront, *White Ops confirmed that it was flagging the YH Websites for the use of undeclared incentivized traffic*." *Id*. at ¶ 94 (emphasis added).
- "In October 2019, White Ops informed AT&T Xandr that '[a] heavy portion of [its] traffic is associated with Incentivized Traffic, which is one of the categories noted in our IVT Taxonomy.'" FAC ¶ 101.
- "In March 2020, AT&T Xandr reported to Young Hollywood that White Ops had 'detected Automated Browsing, Misleading User Interface, and False Representation' on younghollywood.com.'" FAC ¶ 102.
- "In July 2019, White Ops informed Verizon SSP that the traffic on the YH Websites was IVT." FAC ¶ 105.
- "In late January 2020, Rubicon. . .expressed to Young Hollywood that White Ops was reporting 'that vast amounts of the traffic you're getting on the site is bot-generated.'  Rubicon further explained that 'Michael Tiffany [White Ops Co-Founder and President] seems pretty confident that their filtering is accurately classifying [Young Hollywood's] inventory.'" FAC ¶ 110.

10

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

- White Ops "display[ed]" its "false detection of IVT from the YH Websites" on a customer "dashboard[.]" FAC ¶ 139.

In short, the FAC more than "adequately alleges the substance of the allegedly defamatory statement[s]," *Norsat Int'l, Inc. v. B.I.P. Corp.*, 2013 WL 5530771, at *5 (S.D. Cal. Oct. 3, 2013), i.e. that "Young Hollywood's advertising space inventory constitutes IVT." FAC ¶ 125.

White Ops cannot escape this conclusion by claiming that Young Hollywood did not "identify a single report," "any language within one," or "what information was actually included in th[e] . . . 'blacklist[.]'" Motion at 6. First, as outlined above, Young Hollywood identified multiple specific reports and communications made by White Ops. *See* FAC ¶¶ 65, 84, 86, 94, 101-102, 105, 110. More importantly, White Ops' argument ignores the entire thrust of Young Hollywood's defamation claim; namely, that White Ops included the YH Websites on its blacklist/blocklist of "domains associated with fraud" and made multiple communications to that effect to its clients, causing injury to Young Hollywood. FAC ¶ 35. Nothing more need be alleged to identify "the substance of the defamatory statement." *LuxPro Corp. v. Apple Inc.*, 2011 WL 1086027, at *13 (N.D. Cal. Mar. 24, 2011) (allegation that plaintiff's products were "cheap knock-offs," "cheap copies," and "illegal copies" of the defendant's products sufficient for defamation claim). The same holds true for White Ops' statements that Young Hollywood's advertising space inventory constitutes IVT. Whatever else was in a report that communicated this false information to a White Ops client does not bear upon the sufficiency of Young Hollywood's claim for defamation. *See, e.g., Norsat Int'l,*, 2013 WL 5530771, at *5 (allegation that defendant had "counterfeited [plaintiff's] products" sufficient to state claim for defamation).

11

2.    **White Ops' defamatory statements disparage Young Hollywood**

Next, White Ops argues that its false statements about Young Hollywood's IVT levels are not defamatory because they "did not cast aspersions on [Young Hollywood's] business character[,]" but rather "concern[ed] only the nature of certain *traffic* to Plaintiff's websites[.]" Motion at 8 (emphasis in original). This argument is also without merit, as White Ops' defamatory statements brand Young Hollywood's business as fraudulent.

To be defamatory, a disparaging statement must "call into question the plaintiff's honesty, integrity, or competence or reasonably imply a[] reprehensible personal characteristic." *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 550 (1985). It is, however, possible for statements to "effectuate" both "personal aspersion and commercial disparagement." *Id.* That is the case here. *See RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 2065701, at *3 (N.D. Cal. Apr. 29, 2020) (denying motion to dismiss defamation and trade libel claims based on same underlying conduct).

In the digital advertising world, the labels "IVT" and "bot-generated traffic" mean fraud. FAC ¶¶ 32, 52. When White Ops falsely stated that the YH Websites have high levels of IVT and "do not have real human traffic," it suggested that Young Hollywood was "trying to sell fraudulent traffic to advertisers."  *Id.* at ¶ 125. Further, by placing the YH Websites on a blacklist/blocklist "of domains associated with fraud," White Ops implies that Young Hollywood is itself fraudulent or associated with fraud. *Id.* at ¶¶ 35, 47-48. These false assertions of fact about Young Hollywood's "business, practices and products" are sufficient to state a claim for defamation. *Luxpro,* 2011 WL 1086027, at *13; *see also Maponics, LLC v. Wahl*, 2008 WL 2788282, at *4 (N.D. Cal. July 18, 2008) (statements that

12

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

"counterclaimants' 'stole data' and that there are errors in [counterclaimant]'s *products*" actionable as defamation) (emphasis added).[1]

The cases upon which White Ops relies do not suggest otherwise. The plaintiffs' allegations in *Polygram Records*, *Starbuzz Tobacco*, and *Isuzu* were insufficient to state a claim for defamation because the purported false statements related only to the products sold by the plaintiffs (wine, cigarettes, and cars, respectively) and did not "accuse plaintiff of dishonesty, lack of integrity or incompetence" or "imply any reprehensible personal characteristic." *Polygram Records*, 170 Cal. App. 3d at 546; *Starbuzz Tobacco, Inc. v. Abdallah*, 2011 WL 13214313, at *3 (C.D. Cal. Nov. 2, 2011); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1045 (C.D. Cal. 1998). The defamatory statements in this case do more than disparage the quality of Young Hollywood's goods and services. By suggesting that the YH Websites are associated with fraud and that Young Hollywood is trying to sell fraudulent traffic to advertisers, White Ops' statements "accuse plaintiff of dishonesty [and] lack of integrity[.]" *Polygram Records*, 170 Cal. App. 3d at 546.[2]

---

[1] White Ops implicitly acknowledges that Young Hollywood's allegations in Paragraphs 52 and 125 of the FAC are sufficient to state a claim for defamation, but asserts that the Court should overlook these allegations because they are "[w]ithout…factual basis[.]"  Motion at 8-9 (citing FAC ¶¶ 52 and 125). This is wrong. The allegations in these Paragraphs are "reasonable inferences" based on the factual allegations in the FAC. *See Ashcroft*, 556 U.S. at 678.
[2] *Keene v. Lake Publ'g Co.*, 2010 WL 985849, at *2 (Cal. Ct. App. Mar. 18, 2010), an unpublished California Court decision, should not be treated as persuasive authority. Regardless, the decision is of no help to White Ops. In *Keene*, the determination that an article reporting that a patient was "misdiagnosed" with Lou Gehrig's disease was not defamatory turned on the court's finding that the plaintiff had not shown the challenged statement to be substantially false. *Id.* at **9-10. Here, White Ops does not (and, indeed, cannot) challenge the falsity of its statements regarding IVT on the YH Websites.

13

**B.    The FAC States a Claim for Product Disparagement in Violation of the Lanham Act (Count III)**

        **1.    <u>Young Hollywood sufficiently alleged White Ops' misleading representations</u>**

White Ops made false statements: (1) within reports periodically disseminated to its clients, including a blacklist/ blocklist, (2) on dashboards available to its clients, and (3) within specific communications with its customers. FAC ¶ 139. Young Hollywood adequately pleaded the substance of and context surrounding these false statements.[3]

The FAC alleges that White Ops disseminated reports to its clients, and in those reports, "White Ops falsely labeled Young Hollywood's advertising space offerings as IVT." FAC ¶ 89. One report disseminated by White Ops is a blacklist/blocklist "of domains associated with fraud." *Id*. at ¶¶ 35, 47-48. The FAC states that, "in connection with a new algorithm update" implemented on June 28, 2019, White Ops circulated a "blacklist/blocklist" containing the YH Websites "to Verizon, Xandr, Beachfront, and Telaria." *Id*. at ¶¶ 45, 48. The FAC further alleges that White Ops circulated this blacklist/blocklist to "SSPs, advertising purchasers, and others who use White Ops' fraud detection services." *Id*. at ¶ 142. Contrary to White Ops' assertion, these allegations provide the "what" (the blocklist/blacklist which included the YH Websites), the "who" (Verizon, Xandr, Beachfront, Telaria, SSPs, advertising purchasers, and other White Ops clients), and the "when" (in connection with an algorithm update implemented on June 28, 2019) of White Ops' disparagement. *See, e.g., Kilopass Tech. Inc.* 2010 WL 5141843, at *7 (plaintiff

---

[3] The Ninth Circuit has not held that Rule 9(b) applies to Lanham Act claims. *See Kilopass Tech. Inc. v. Sidense Corp.*, 2010 WL 5141843, at *7 (N.D. Cal. Dec. 13, 2010). Because the Lanham Act does not contain an intent requirement, the reasoning of those district courts within the Ninth Circuit that have applied the heightened pleading standard of Rule 9(b) to Lanham Act false advertising cases is necessarily flawed. *See Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980) (Section 43(a) of the Lanham Act "does not require proof of intent to deceive"). Even if Rule 9(b) were to apply here (and it does not), Young Hollywood has met this heightened standard.

14

adequately pleaded Lanham Act product disparagement by alleging "who published the statements. . . , their general content, and why they are allegedly false").

The FAC also sufficiently alleges that White Ops displayed its "false detection of IVT from the YH Websites" on dashboards available to its "over 200 clients." FAC ¶ 139. The FAC explains that White Ops provides its customers with a dashboard which enables those clients to view the results of White Ops' filtering. *Id*. Following its algorithm update on June 28, 2019, White Ops began to falsely identify traffic to the YH Websites as IVT. *Id*. at ¶ 44. These false detection results were displayed on client dashboards. *Id*. at ¶ 139. Here again, the allegations regarding the client dashboards identify the "what" (the dashboards displaying the false IVT information), the "who" (White Ops' "over 200 clients"), and the "when" (after June 28, 2019) of White Ops' false and misleading statements.

The FAC is also replete with details regarding the substance of specific false statements made directly by White Ops to Prodege, Telaria, Beachfront, Xandr, Index Exchange, Verizon SSP, and Rubicon. *See, e.g.,* FAC ¶¶ 65, 84, 86, 94, and 101. White Ops cannot avoid these allegations by selectively citing to statements from third parties. Motion at 11.

The allegations in this case are not comparable to those in *Bragel Int'l, Inc. v. Kohl's Dep't Stores, Inc.*, 2018 WL 5858535 (C.D. Cal. June 5, 2018) or *ProSolutions Software, Inc. v. DemandForce, Inc.*, 2013 WL 12139120 (C.D. Cal. Mar. 7, 2013). In *Bragel*, the counterclaimant pleaded "only that [plaintiff] . . . made false representations 'in the marketplace' to customers and potential customers of counterplaintiff" and did not "identify the communications" in which the plaintiff "made the false representations or explain the context of the false statements." 2018 WL 5858535, at *3. Similarly, in *ProSolutions,* the plaintiff alleged only "that [defendant] made certain misrepresentations regarding the parties' relationship 'in promotions, advertising, and marketing in commerce.'" 2013 WL 12139120, at *1. Here, as described in detail in the three preceding paragraphs, Young Hollywood

15

identifies the specific communications in which White Ops made false statements

and the context surrounding those statements.

**2.** **White Ops' false statements constitute commercial promotion under the Lanham Act**

**a.** **White Ops' false statements are commercial speech**

To determine whether expression is commercial speech satisfying the first

requirement of "commercial promotion" under the Lanham Act, courts consider

whether: the speech is in an advertising format, refers to a specific product at issue,

and/or if the speaker has an economic or commercial motive for making the

statements. *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004)

(citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983)).

First, White Ops has a commercial motive for making the statements. "White

Ops sends reports to its clients to show the utility of its fraud detection capabilities

so that its clients continue subscribing to its service." FAC ¶¶ 35, 141.

Contrary to White Ops' assertion, the statements at issue do not relate solely "to

commercial transactions that have already occurred[.]" Motion at 14 (citing

*Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935, at *8 (C.D. Cal. Aug. 2, 2005)).

White Ops' "customers pay a monthly subscription fee in exchange for White Ops'

services." FAC ¶ 30. This means that these clients need to actively decide, on at

least a monthly basis, whether to continue subscribing to and paying for White Ops'

services. *See PAX Water Techs., Inc. v. Medora Corp.*, 2019 WL 4390567, at *7

(C.D. Cal. Aug. 5, 2019) (statements "used to persuade actual or potential customers

to purchase Defendant's product" sufficient to constitute commercial speech). In

this way, the reports, dashboards, and other statements made by White Ops are not

like the "copies of [insurance] policies" found not to be commercial speech in

*Gonzalez*,  2005 WL 5891935, at *8. Rather, they are more akin to the statements in

*Gonzalez* that "were made for the purpose of influencing consumers to buy

Allstate's products, whether by renewing a policy already in place or by purchasing

16

additional coverage[.]" *Id.* Moreover, White Ops' business model involves flagging traffic as IVT, and then using that IVT finding—whether true or not—to induce the flagged publisher (or advertiser or SSP) to become a client. *See* FAC ¶¶ 55-59, 88, 134. In this way, White Ops' reports and dashboards influence new customers to subscribe to its services. The allegations that outline how White Ops uses its reports to attract new customers distinguish the facts presented in this case from those before the court in *Vidillion, Inc. v. Pixalate, Inc.*, 2019 WL 3308768, at *1 (C.D. Cal. June 5, 2019).

That White Ops intended to guide its clients' purchasing decisions and those of advertisers does not change the fact that White Ops made false statements for the purpose of influencing new and existing customers to subscribe to *White Ops'* services. FAC ¶¶ 35, 141. The factual allegations in this case are therefore distinguishable from those in *Alfasigma USA, Inc. v. First Databank, Inc.*, where the plaintiff alleged only "that defendant influenced decisions that consumers made to buy [plaintiff]'s goods—not [defendant]'s own goods or services[.]" 398 F. Supp. 3d 578, 591 (N.D. Cal. 2019).[4]

Second, as previously detailed (*See* Section IV.A.1), White Ops' false statements "refer[] to a specific product at issue," namely, the YH Websites, and therefore the statements satisfy the second *Bolger* factor. *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1106. White Ops acknowledges this, but claims that White Ops'

---

[4] *Genus Lifesciences, Logisticare,* and *G.U.E. Technologies* are distinguishable on this same basis. In each of these cases, the plaintiff failed to allege that the statements were made for the purpose of inducing customers to enter into a commercial transaction with the defendant. *See Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 845 (N.D. Cal. 2019), *reconsideration denied*, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019) (plaintiff did not allege that statements by a pricing list company were made "for the purpose of inducing . . . customers to enter into a commercial transaction with [the pricing list company]."); *Logisticare Sols., LLC v. Cal. Med. Transp. Ass'n, Inc.*, 2018 WL 5099663, at *6 (C.D. Cal. May 21, 2018) (plaintiff "pled no facts supporting its contention that [defendant's] communications were 'for the purpose of influencing consumers to buy defendant's goods or services.'"); *G.U.E. Tech, LLC v. Panasonic Avionics Corp.*, 2016 WL 6138422, at *6 (C.D. Cal. Feb. 4, 2016) (statements not commercial because defendant "was not itself proposing a commercial transaction with th[e] airlines" to whom the statements were directed).

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

statements are simply a "neutral investigation of others' products by non-competitors," similar to a consumer report, and should not qualify as commercial speech. Motion at 16. But White Ops' IVT findings are anything but "neutral." Among other things, they are intended to convince the flagged entities that they should become White Ops customers. *See* FAC ¶¶ 138-142. White Ops may "position itself as an independent and unbiased reviewer," but it is "actually engaged in some form of commercial product promotion." *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073, 1096 (C.D. Cal. 2019). In short, White Ops is not neutral and cases like *Ariix, LLC v. NutriSearch Corp.*, 2018 WL 1456928 (S.D. Cal. Mar. 23, 2018) are therefore inapposite.

Young Hollywood acknowledges that White Ops' statements were not presented in an "advertising format." Motion at 16. But false statements "need not be made in a 'classic advertising campaign'" in order to be commercial speech. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1054 (9th Cir. 2008) (internal citation omitted); *see, e.g., Dynamic v. Blossom Footwear, Inc.*, 2009 WL 10674326, at *4 (C.D. Cal. Apr. 28, 2009) (denying motion to dismiss Lanham Act product disparagement claim where statement to a trade magazine was "not in a traditional advertising format," but could constitute commercial speech). Where, as here, the other *Bolger* factors are satisfied, speech can be commercial even when it is not presented as a traditional advertisement. *Bolger,* 463 U.S. at 67, n.14.

> **b.** **Young Hollywood adequately alleged dissemination of the false statements**

The relevant purchasing public in this case is comprised of SSPs, advertising purchasers, and other companies who use White Ops' fraud detection services. FAC at ¶142. All of these White Ops clients received the reports containing false claims about Young Hollywood. *Id. See also* Section IV.A.1 (detailing the false statements).

18

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

White Ops claims that the alleged dissemination is not enough, pointing to the court's finding in *Vidillion* that "[d]isseminat[ion] to a number of [plaintiff's] advertising demand partners" was not "wide dissemination within the relevant purchasing public." *Vidillion, Inc.*, 2019 WL 3308768, at *1. It is not clear how the court defined the "relevant purchasing public" for purposes of its decision in *Vidillion* and it is therefore hard to compare the allegations in that case to those made here. What is clear is that when it comes to determining what constitutes widespread dissemination, this Court is bound by the guidance set out by the Ninth Circuit in *Coastal Abstract Serv. v. First American Title*, 173 F.3d 725, 735 (9th Cir. 1999). "The teaching of *Coastal Abstract* is that promotion, as it is to be understood in the Lanham Act, is different from the traditional understanding of *advertising* as 'widespread promotional activities usually directed to the public at large.'" *Gonzalez*, 2005 WL 5891935, at *7 (emphasis in original) (internal citations omitted). The Lanham Act inquiry focuses exclusively on the "relevant industry." *Id.* Where the purchasing public for the relevant industry is small, "even a single promotional representation to an individual purchaser may be enough to trigger the protections of the Act." *Coastal Abstract*, 173 F. 3d at 735.

In this case, the relevant industry, in its narrowest sense, consists of providers of supply side platforms—SSPs. FAC ¶142. This is a small group. Because the number of SSPs is so limited, Young Hollywood does not have the option to partner with an SSP who is not a White Ops client (and who has not received the false statements). *Id*. Given the size of the industry, dissemination of multiple false statements to at least five SSPs (and all of White Ops' clients) should be "enough to trigger the protections of the [Lanham] Act." *Coastal Abstract*, 173 F. 3d at 735. Young Hollywood's allegation that the statements were "'disseminated sufficiently to the relevant purchasing public' may turn out to be true or false, but" it more than "suffices for purposes of stating a claim." *Newcal Indus.*, 513 F.3d at 1054.

19

Accepting the allegations in the FAC as true, as this Court must, White Ops' motion to dismiss Young Hollywood's Lanham Act claim should fail.

### C.   The FAC States a Claim for Intentional and Negligent Interference with Prospective Business Advantage (Counts V and VI)

White Ops does not dispute that Young Hollywood has stated claims for interference with respect to its relationships with Telaria and Prodege. *See* Motion at 19. Young Hollywood's claims for intentional and negligent interference therefore necessarily survive this motion. Nonetheless, White Ops seeks to dismiss Young Hollywood's interference claims with respect to "its relationships with various third-party advertising platforms, apart from Telaria and Prodege[.]" *Id.* These claims are adequately pleaded and should not be dismissed.

### 1.   <u>The FAC sufficiently identifies the relationships with which White Ops interfered</u>

White Ops first argues that the interference claims that do not involve Telaria and Prodege are deficient because Young Hollywood "does not sufficiently identify" the relationships with which White Ops interfered, Motion at 19, ignoring the many allegations in the FAC to the contrary. The FAC states that White Ops interfered with Young Hollywood's relationships with "Beachfront, AT&T Xandr, Index Exchange, [and] Rubicon," clearly identifying the relationships that are the subject of the interference claims. FAC ¶ 151; *see also id*. at ¶ 159. Moreover, the FAC includes allegations describing Young Hollywood's relationships with each of these five SSPs. *See id*. at ¶¶ 90-95 (Beachfront); ¶¶ 96-98 (Index Exchange); ¶¶ 99-104, 120-121 (Xandr); ¶¶ 105-108 (Verizon SSP); ¶¶ 109-111 (Rubicon).

White Ops' reliance on *Silicon Knights, Inc. v. Crystal Dynamics, Inc*., 983 F. Supp. 1303, 1312 (N.D. Cal. 1997) in support of its argument that Young Hollywood did not adequately specify the relationships is misplaced. In *Silicon Knights*, the court determined that the plaintiff failed to state a claim for interference because the complaint did not include allegations "from which the court…could

20

infer the probable disruption of an actual economic relationship[.]" *Id.* The court specifically highlighted the plaintiff's failure to "allege it was in the midst of negotiations" with a publisher who "pulled out." *Id.*

Here, Young Hollywood alleges the precise facts the court found to be lacking in *Silicon Knights*. For example, with respect to Xandr, the FAC alleges that Young Hollywood "entered into an agreement to sell advertising on the AT&T Xandr platform" but was unable to do so because White Ops "blacklist[ed] the YH Websites[.]" FAC ¶¶ 99-100. Similarly, the FAC states that "Young Hollywood…entered into talks with Rubicon Project, a digital advertising infrastructure company, to sell the YH Websites' advertising inventory on the Rubicon exchange[,]" but those talks fell through as a result of reports from White Ops that "vast amounts" of traffic on the YH websites was "bot-generated[.]" *Id.* at ¶¶ 109-111. The FAC contains similar allegations regarding Young Hollywood's relationships with Beachfront, Index Exchange, and Verizon SSP. *See id.* at ¶¶ 91-92 (Young Hollywood "attempted to launch with Beachfront" but was unable to do so because "100% of Young Hollywood's requests were. . .blocked by White Ops prebid."); *Id.* at ¶¶ 96-98 (Young Hollywood "tried to sell its video advertisements through the global advertising marketplace, Index Exchange, but was unable to do so" because its websites were on a blacklist); *Id.* at ¶ 106 ("Young Hollywood attempted to partner with Verizon SSP[,]" but before it "could begin selling its inventory," Verizon SSP ended the relationship "because of the White Ops flag"). None of these relationships are speculative. Young Hollywood adequately alleges that it sought to work with all five of these SSPs, but that as a result of White Ops' interference, it was unable to partner successfully with any of them. *Id.* at ¶¶ 90-111, 120-121.

21

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

2.   **The FAC sufficiently alleges White Ops' knowledge of Young Hollywood's relationships**

White Ops next claims that the FAC "fails to plead that White Ops had knowledge of its business relationships." Motion at 22. This argument is meritless.

"[A]s a sophisticated party in the digital advertising landscape," White Ops "generally knows the workings of an SSP platform" and "is familiar with the relationship between a publisher like Young Hollywood and advertisers on an SSP platform." FAC ¶ 43. Given this familiarity, when White Ops receives an inquiry from an SSP regarding a publisher's website through its MediaGuard pre-bid filter, it follows that the publisher is a client of the SSP, or is trying to be. The SSP would have no reason to query the MediaGuard pre-bid filter regarding a website that was not selling its advertising space inventory on the SSP's platform (or trying to). Put differently, "[i]t strains the imagination to say that [White Ops] received a request from" an SSP regarding the YH Websites' traffic, "but was not aware that [these SSPs] intended to imminently [offer for] purchase" advertising inventory on the YH Websites. *G.U.E. Tech*, 2015 WL 12696203, at *6 (software company adequately pleaded in-flight entertainment system provider's knowledge of relationship between software company and an airline where the airline sent "requests for updates" to in-flight entertainment system provider in order to facilitate implementation of software company's game into the in-flight entertainment system). Indeed, the entire purpose of White Ops' MediaGuard product is to evaluate requests from SSPs "in near real-time," Motion at 3, immediately "before publishers' advertising inventory is offered to advertisers for bidding." FAC ¶ 32.

Young Hollywood does not simply rest on White Ops' generalized knowledge of the way its industry and its product function to support its interference claims. To the contrary, the FAC contains specific allegations regarding White Ops' knowledge of Young Hollywood's relationships with Beachfront, Xandr, Index Exchange, Verizon SSP, and Rubicon, as outlined below. *See Korea Supply Co. v.*

22

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

*Lockheed Martin Corp*., 29 Cal. 4th 1134, 1153 (2003) ("to satisfy the intent requirement for this tort, it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.").

**Beachfront.** The FAC alleges that "in October 2019, in response to an inquiry from Beachfront, White Ops confirmed that it was flagging the YH Websites for the use of undeclared incentivized traffic." FAC ¶ 94; *see also id*. at ¶ 84 ("White Ops informed three SSPs (AT&T Xandr, Beachfront, and Verizon) that it was blocking Young Hollywood's inventory for use of undeclared incentivized traffic"). White Ops' response to Beachfront's inquiry demonstrates that it was aware of the relationship between its client, Beachfront, and the publisher about which Beachfront inquired, Young Hollywood. *See id*. at ¶ 94.

**AT&T Xandr.** The FAC explains that "in October 2019, White Ops informed Xandr that '[a] heavy portion of the traffic" on the YH Websites was "associated with Incentivized Traffic[.]'" FAC ¶ 101; *see* also *id*. at ¶ 84. In March 2020, White Ops reported similar findings, this time detecting "Automated Browsing, Misleading User Interface, and False Representation[.]" *Id*. at ¶ 102. White Ops' responses show its knowledge of Young Hollywood's relationship with Xandr. *Id*. at ¶ 103. Moreover, Young Hollywood made White Ops' Co-Founder and President, Mr. Tiffany, aware of its partnership with Xandr. *Id*. at ¶¶ 77, 79.

**Rubicon.** The FAC alleges that Rubicon discussed Young Hollywood with White Ops' Co-Founder and President, who expressed to Rubicon his confidence "that [White Ops'] filtering [wa]s accurately classifying [Young Hollywood's] inventory' as "bot-generated." FAC ¶ 110. Further, and as with Xandr, Young Hollywood made White Ops aware of its partnership with Rubicon. *Id*. at ¶ 79.

**Verizon SSP.** Verizon SSP was a client of White Ops and in July 2019, "White Ops informed Verizon SSP that the traffic on the YH Websites was IVT." FAC ¶ 105; *see also* FAC ¶ 84. As with the queries and responses described above,

23

this is enough to show that White Ops had knowledge of the relationship between Verizon SSP and Young Hollywood.

**Index Exchange**. Index Exchange is also a client of White Ops and, in that capacity, Index Exchange made inquiries "regarding the YH Websites through MediaGuard[.]" FAC ¶¶ 97-98. In response, White Ops communicated to "Index Exchange [. . .] the false claim that Young Hollywood's inventory is IVT." *Id*. at ¶ ¶153, 161. These allegations are sufficient to establish that White Ops had knowledge of Young Hollywood's prospective relationship with Index Exchange.

### 3. The FAC sufficiently alleges that White Ops took action to disrupt Young Hollywood's relationship with Index Exchange[5]

Finally, White Ops argues that Young Hollywood "fail[ed] to point to any action that White Ops took to disrupt Plaintiff's relationship with Index Exchange[.]" Motion at 24. This is not true.

Index Exchange became a client of White Ops in 2017. FAC ¶ 97. After White Ops placed the YH Websites on its blacklist in late June 2019, Index Exchange, in turn, placed the YH Websites on "the company's 'global blacklist'" which can occur when websites are on an "external blacklist[.]" *Id*. at ¶¶ 48, 96-97. Given these allegations, it is plausible to infer that Index Exchange placed the YH Websites on its own blacklist because it received the White Ops blacklist, which included the YH Websites. *See Parravano v. Babbitt*, 861 F. Supp. 914, 918 (N.D. Cal. 1994) ("The Court must . . . indulge all reasonable inferences to be drawn from" the factual allegations of the complaint). White Ops' actions, in other words, prevented Young Hollywood from selling its pre-roll advertisements through Index Exchange's marketplace.

---

[5] Young Hollywood is not asserting claims for intentional or negligent interference with prospective business advantage based on its relationships with Playbuzz and Freestar. *See* FAC Counts V and VI.

24

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**

1     Unlike the plaintiffs in *Celebrity Chefs Tour, LLC v. Macy's, Inc*., Young

2   Hollywood has alleged that White Ops took specific actions that disrupted Young

3   Hollywood's relationship with Index Exchange. 16 F. Supp. 3d 1141, 1157 (S.D.

4   Cal. 2014). These allegations are sufficient to state a claim for interference. *See*

5   *Code Rebel, LLC v. Aqua Connect, Inc.*, 2013 WL 5405706, at *7 (C.D. Cal. Sept.

6   24, 2013) (denying motion to dismiss intentional and negligent interference claims

7   where defendant embarked on a pattern of disparagement of plaintiff and

8   its program).

9   **V.    CONCLUSION**

10     For the reasons set forth above, the Court should deny White Ops' motion to

11   dismiss certain claims in the FAC. In the event the Court grants, in whole or in part,

12   the motion to dismiss the claims, Plaintiff requests leave to amend the dismissed

13   claims.

14

15    DATED:  July 20, 2020                    Brendan J. O'Rourke
                                               Jonathan M. Weiss
16                                             Lee Popkin
                                               Simona Weil
17                                             PROSKAUER ROSE LLP

18

19

20                                             */s/ Jonathan M. Weiss*

21                                             Attorneys for Plaintiff,
                                               Young Hollywood LLC

22

23

24

25

26

27

28

**OPPOSITION TO MOTION TO DISMISS CERTAIN CLAIMS IN FIRST**
**AMENDED COMPLAINT (Case No. 2:20-cv-3334 PA (RAOx))**